**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

**DAVID PARKER**                                                                                          **PLAINTIFF**

v.                                      **CASE NO.  2:08CV00119 BD**

**MICHAEL J.  ASTRUE,
Commissioner,
Social Security Administration**                                                              **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Plaintiff David Parker has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits under Title II and Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act[1] (the "Act").  For the reasons that follow, the decision of the Administrative Law Judge ("ALJ")[2] is affirmed.

**I.    Procedural History:**

On January 11, 2005, Plaintiff filed an application for Title II disability insurance benefits and Title XVI supplemental security income, alleging that he became disabled on June 1, 2001 as a result of a head injury, migraine headaches, and blurred vision.  (Tr. 127-131)  Plaintiff's claim was denied initially and on reconsideration, after which Plaintiff filed a request for a hearing.  (Tr. 19, 43-48)

---

[1] 42 U.S.C. § 1381, *et seq*.

[2] The Honorable Don Curdie, Administrative Law Judge.

1

On August 9, 2007, the ALJ held a hearing, which Plaintiff attended with his non-attorney representative, Kathy Grady. (Tr. 19, 325-343) The ALJ received testimony from Plaintiff and David O'Neal, a Vocational Expert ("VE"). (Tr. 325-343) On September 26, 2007, the ALJ denied Plaintiff benefits. (Tr. 19-31) Plaintiff sought review from the Appeals Council, but was denied review on April 4, 2008. (Tr. 4-6) On June 19, 2008, Plaintiff filed the current Complaint for Review of Decision (Docket Entry #1).

## II.   Background:

At the time of the hearing, Plaintiff was a 33-year-old male. (Tr. 327) He had completed high school but had no additional vocational or other training.[3] (Tr. 328) Plaintiff had held a variety of jobs, including working as a forklift driver in 1994. (Tr. 330)

On January 8, 2004, Plaintiff was admitted to Health Resources of Arkansas for treatment of paranoia and facial pain from a prior facial injury. (Tr. 181-189) Plaintiff suffered from anxiety, and stated that he felt that "everybody [was] out to hurt [him]." (Tr. 183) It appears an Advanced Practice Nurse ("APN") diagnosed Plaintiff with major depressive disorder ("MDD") with paranoia, chronic post-traumatic stress disorder ("PTSD"), and cannabis dependence. (Tr. 188-189) It was noted that Plaintiff was a sexual and physical abuse victim. (Tr. 188)

---

[3] During a mental status evaluation, Plaintiff reported vocational training in aircraft mechanics. (Tr. 195)

Later that month, Plaintiff was evaluated by the White River Rural Health Augusta Medical Clinic. (Tr. 246) The physician noted that Plaintiff complained of constant headaches, and that his stomach was bothering him. (Tr. 246) The Radiology Report stated that Plaintiff had a history of trauma from the previous year, and suffered from headaches. (Tr. 247) A computed tomography ("CT") scan of Plaintiff's brain, however, returned negative.[4]

On February 4, 2004, Plaintiff was again evaluated by the White River Rural Health Augusta Medical Clinic. (Tr. 245) This time, the physician opined that Plaintiff's "headache [did] not sound like migraine, more tension type." (Tr. 245)

Throughout March of 2004, Plaintiff received assistance from an intervention specialist for a variety of legal and personal issues that had arisen in his life. (Tr. 161-177) On March 9, 2004, an APN[5] listed Plaintiff's diagnoses as PTSD, MDD, mood disorder, post-concussion syndrome, cannabis dependence, facial and neck pain, gastric ulcers, and acid reflux. (Tr. 177) Plaintiff was prescribed Paxil and Trazodone. At the time, Plaintiff smoked three marijuana cigars per day. The APN commented that Plaintiff was applying for disability. (Tr. 177)

---

[4] Specifically, the Radiology Report lists the findings as follows: "Examination reveals no mass, mass effect, or intracranial hemorrhage. No abnormal enhancement is seen. The ventricular system is not distorted or dilated. No abnormal extra-axial fluid collection is seen." (Tr. 247)

[5] The name of the APN is illegible.

On March 30, 2004, Dr. P. Scott Ballinger, M.D., gave a detailed explanation of Plaintiff's physical state at that time. (Tr. 160) Dr. Ballinger stated that:

> "[Plaintiff's] review of systems was essentially normal. [Plaintiff's] physical examination revealed minimal, if any, facial asymmetry. [Plaintiff] appeared to have good occlusion with a normal bite. [Plaintiff] stated that he had pain when he squinted his eyes. [Plaintiff's] pain seems to be atypical." (Tr. 160)

In June and July of 2004, Plaintiff again visited the Health Resources of Arkansas and received counseling services. (Tr. 165-168) Plaintiff's intervention specialist listed Plaintiff's diagnoses as PTSD chronic, MDD with paranoia, and depression. (Tr. 165-168)

In November, 2004, a physician reviewed Plaintiff's medical records and found evidence of MDD with psychotic features. (Tr. 161) Plaintiff had a Global Assessment of Functioning ("GAF") score of 55.[6] (Tr. 161) The physician noted that the evaluation was not based on a direct examination of Plaintiff. (Tr. 161)

On March 11, 2005, a physician reported that Plaintiff responded well to treatment with Lortab for his frontal and bilateral maxillae headache. (Tr. 191) Later that month, Plaintiff sought treatment for blurry vision and light sensitive eyes. (Tr. 192) The examination revealed that Plaintiff had no unusual problems with his eyes, and that Plaintiff's farsightedness was correctable by using eyeglasses. (Tr. 192)

---

[6] The Diagnostic and Statistical Manual of Mental Disorders (4th ed.) (DSM-IV), published by the American Psychiatric Association, states that a GAF of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. (DSM-IV 32).

4

A May 4, 2005, Plaintiff underwent a mental status examination, performed by Dr. Kenneth Hobby, a licenced psychologist. (Tr. 193-203) Dr. Hobby noted that Plaintiff was well-groomed, had no physical abnormalities, and looked very strong and fit. (Tr. 193) Dr. Hobby also noted that Plaintiff was friendly and cooperative, and had no unusual behavior. (Tr. 193-194) Plaintiff reported no inpatient treatment for emotional or psychiatric problems. (Tr. 194) He attended three sessions of outpatient therapy, and reported previous therapy a year prior to this evaluation. (Tr. 194) Plaintiff was not taking any medications at the time, though he had taken Paxil and sleeping pills a year prior. (Tr. 194)

According to Dr. Hobby's report, "[n]o indications of pain were displayed [by Plaintiff]." (Tr. 194) Plaintiff exercised regularly and was capable of self-care, personal hygiene, and dressing. (Tr. 200) He could drive alone for up to seventy miles from home, despite poor night vision. (Tr. 200-201) Plaintiff was able to cook, follow an adequate nutritional plan, shop for groceries and clothes, use a checkbook and pay bills, and could do almost any household chore on a daily basis. (Tr. 200-201) Accordingly, Dr. Hobby determined that Plaintiff was "able to take care of himself on a daily basis." (Tr. 200)

During the mental status evaluation, Plaintiff described "a vision [of himself] being mangled as if he jumped out of the car" when detailing his complaints and symptoms to Dr. Hobby. (Tr. 194) Plaintiff complained that exposure to chemicals during previous employment had made his face break out and his bones hurt. Plaintiff

5

stated that he had to smoke a lot of marijuana because of this. (Tr. 194, 196) Dr. Hobby "[didn't] believe much of what [Plaintiff told] him," and found "[Plaintiff's] report of 'visions' not believable." (Tr. 202) Accordingly, Dr. Hobby diagnosed Plaintiff with malingering cognitive and psychosis symptoms, cannabis dependence, and antisocial and dependent personality traits. (Tr. 199) Dr. Hobby determined that Plaintiff's IQ was above 80, in the normal range, and that Plaintiff's GAF score was 60. (Tr. 199-201) Dr. Hobby noted that Plaintiff did not suffer from any unusual social behaviors, and that there was no evidence of unusual passivity, dependence, aggression, impulsiveness, or withdrawal. (Tr. 200) Finally, Dr. Hobby noted:

> [Plaintiff] has the ability to understand, carry out, and remember instructions. There appears to be a good capacity to respond to supervision, and the most likely area of difficulty is his motivation. There appears to be the capacity to respond appropriately to coworkers, and the most likely area of difficulty here is his motivation. [Plaintiff] would probably respond adequately to work pressure in a work setting. (Tr. 202)

A subsequent evaluation on May 9, 2005, revealed that Plaintiff suffered from only mild to moderate limitations. (Tr. 214, 218-219)

On May 19, 2005, Plaintiff returned to the White River Rural Health Augusta Medical Clinic complaining of nasal and chest congestion and cough. (Tr. 228) After he refused Ultram to treat the congestion and cough and demanded other medications, Plaintiff's physician refused to continue treating him. (Tr. 228) Plaintiff continued to visit White River Rural Health Augusta Medical Clinic to receive follow-up care and medication throughout 2005 and 2006. (Tr. 229-252) Plaintiff also was treated by Dr.

James M. Merritt, M.D., who put Plaintiff on a pain management plan in February, 2006. (Tr. 278-283)  A month later, Dr. Merritt noted that Plaintiff was "doing well."  (Tr. 276)  After another month passed, Plaintiff again visited Dr. Merritt, who reported that Plaintiff was still "doing well" on the pain management plan.  (Tr. 273)

On August 16, 2006, Plaintiff visited Dr. Merritt and complained of pain on the left side of his face after chewing gum.  (Tr. 267)  Although Plaintiff complained of reflux, Dr. Merritt noted that Plaintiff was in the habit of eating late, and using caffeine and eating snacks.  (Tr. 267)  On February 14, 2007, Dr. Merritt again noted that Plaintiff was "doing well."  (Tr. 261)

On November 28, 2006, Plaintiff visited White River Rural Health Augusta Medical Clinic, where physicians described Plaintiff as "generally healthy."  (Tr. 250)  On March 28, 2007, Dr. Larry R. Killough saw Plaintiff regarding a throat problem, and noted: "[one] week sore throat and [slight] cough, want[ed] narcotic med[ications] as always!"  (Tr. 248)  After Dr. Killough offered Plaintiff Bidex DM to treat the cough, Plaintiff became upset, and stated, "I know what my body needs."  (Tr. 248)  Dr. Killough told Plaintiff that if he insisted on narcotic cough medication, he would have to find another physician.  (Tr. 248)

Plaintiff also submitted records from July 12, 2005, to December 3, 2007, to the Appeals Council.  (Tr. 286-324)  During this time, a Licensed Professional Counselor and a Licensed Clinical Social Worker assessed Plaintiff with a variety of GAF scores, from a

low assessment of 38[7] (Tr. 295) to numerous assessments of 50 and 55. (Tr. 301, 302, 303, 306, 308, 311-316, 319, 322-324)

### III. Findings of the ALJ:

The ALJ followed the mandatory fire-step framework set forth by the Social Security Administration and codified in 20 C.F.R. § 416.920. (Tr. 19-31) In doing so, the ALJ found that: (1) Plaintiff had not engaged in substantial gainful activity since June 1, 2001; (2) Plaintiff's history of facial fracture, PTSD with MDD, cannabis dependence with anti-social and dependent personality traits, gastroesophageal reflux disease, headache, and neck pain were all "severe" within the meaning of the Social Security Regulations; (3) Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had past relevant work as a forklift driver, was unable to perform that work, but retained the residual functional capacity ("RFC") to perform a significant range of light work[8] on a sustained basis, in a work setting where interpersonal contact is routine but superficial, the complexity of tasks is learned by

---

[7] The Diagnostic and Statistical Manual of Mental Disorders (4th ed.) (DSM-IV), published by the American Psychiatric Association, states that a GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. (DSM-IV 32).

[8] "Light work" is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

experience, with several variables requiring the use of individual judgment within limits, and where supervision required is little for routine tasks, but detailed for non-routine tasks; and (5) a significant number of jobs existed in the economy which Plaintiff was capable of performing. (Tr. 19-31)

Plaintiff's sole argument is that the Commissioner's decision is not supported by substantial evidence because the ALJ did not obtain all of Plaintiff's mental health records (Docket Entry # 7). Defendant responds that the Commissioner's decision should be affirmed as supported by substantial evidence because the ALJ adequately developed the record, and the result would have been the same regardless of whether the ALJ had considered the supplemental records (Docket Entry # 11).

IV. **Legal Analysis:**

A. **Standard of Review**

In reviewing the ALJ's decision, this Court must determine whether there is substantial evidence in the administrative record to support the decision. 42 U.S.C. § 405(g). This review function is limited, and the decision of the ALJ must be affirmed "if the record contains substantial evidence to support it." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). "Substantial evidence is less than a preponderance but enough so that a reasonable mind could find it adequate to support the decision." *Id.* Evidence that both supports and detracts from the ALJ's decision must be considered, but the decision cannot be reversed "merely because there exists substantial evidence supporting a different outcome." *Id.* "Rather, if, after reviewing the record, . . . it is possible to draw

two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, we must affirm the decision of the [ALJ]." *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citations and quotations omitted). Thus, the Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997); 42 U.S.C. § 405(g).

### B. The ALJ did not Err in Developing the Medical Record

Although an ALJ "must fully and fairly develop the record so that a just determination of disability may be made," an ALJ "is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994) (internal quotations and citations omitted). In developing a reasonably complete record, an ALJ is not required to obtain "additional medical evidence so long as other evidence in the record provides sufficient basis for the ALJ's decision." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (*quoting Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994) (internal quotations omitted)). Accordingly, an ALJ's decision will not be reversed unless the failure to develop the record is unfair or prejudicial. *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (citing *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)).

Plaintiff argues that the ALJ's statement, that "there is no evidence of continued mental health treatment after November 2004" (Tr. 27), shows that the ALJ did not consult all available mental health records (Docket Entry # 7, p. 5). Even if this is true, it

is irrelevant, "so long as other evidence in the record provides sufficient basis for the ALJ's decision." *Anderson*, 51 F.3d at 779.  The ALJ clearly did not base his decision on a perceived failure to seek medical treatment.  Instead, the ALJ reviewed all of the mental health records provided by Plaintiff.  The ALJ sent Plaintiff to a Mental Status and Evaluation of Adaptive Functioning Consultative Examination (Tr. 193-203), and had Disability Determination physicians complete a Psychiatric Review Technique (Tr. 204-217) and a Mental Residual Functional Capacity Assessment (Tr. 218-227) regarding the limitations presented by Plaintiff's impairments.

In denying Plaintiff's claim, the ALJ considered a variety of mental health records and psychologist opinions.  (Tr. 26-29)  In addition, the ALJ specifically asked Plaintiff if his recent records were part of the file.  (Tr. 333)  Plaintiff's representative stated that some were, and she gave the ALJ additional records from Dr. Killough, who was treating Plaintiff for mental problems and depression, the day of the hearing (Tr. 333-334)  The ALJ again asked about treatment and the following exchange occurred:

| | |
|---|---|
| [ALJ]: | Now, does this depression and mental problems, do they go up past '04?  I mean, does the treatment go past '04? |
| [Representative]: | Yes, sir. Mr. Parker, when the - - the Judge just asked you when was the last time you went for treatment - - |
| [Plaintiff]: | Just last - - |
| [Representative]: | - - to mental - - |
| [Plaintiff]: | - - week. |

11

| | |
|---|---|
| [Representative]: | Okay. And then was there a period when you stopped? |
| [Plaintiff]: | Yeah there was - - when I was going through my divorce. My wife had me - - she had my head and I don't know. She had my head in the clouds and - - |

There was no testimony regarding how long Plaintiff stopped going to treatment. The only testimony was that there was some gap in treatment, that there were "some" records of recent treatment in the file, and additional records from Dr. Killough were submitted at the hearing. (Tr. 333-334)

Although the ALJ did not have access to the supplemental mental health records, "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). That is especially true in this case. The ALJ specifically asked Plaintiff about recent records and received a vague and potentially misleading answer. Were the recent records the same records from Dr. Killough that were submitted at the hearing? Plaintiff only listed Dr. Merritt and Dr. Killough when asked who would have medical records about Plaintiff's impairment since his last disability report. (Tr. 79-81, 85) Records from both doctors were submitted at the hearing and reviewed by the ALJ. (Tr. 24-29, 248-284) It was not error for the ALJ to rely on the information Plaintiff submitted to him. The ALJ's failure to seek out records that Plaintiff failed to identify also does not constitute error.

Even if the ALJ erred in relying on the information and records provided by Plaintiff, it was neither unfair nor prejudicial, as substantial evidence supports the ALJ's determination. *Shannon*, 54 F.3d at 486. Absent unfairness or prejudice, remand is not appropriate. *Onstad*, 999 F.2d at 1234.

Plaintiff does not make any argument regarding fairness. It was not unfair for the ALJ to rely on Plaintiff to provide, or identify, medical records or sources that supported his claims. Regarding prejudice, Plaintiff states that the ALJ's decision might have been different if the additional mental health records had been considered (Docket Entry # 7). Plaintiff admits, however, that the Appeals Council considered the supplemental mental health records and still found no reason to review the ALJ's decision (Docket Entry # 7, p. 1, 3, 6). (Tr. 4-6) In addition, Plaintiff fails to describe how the decision "may have been different" or what additional limitations were supported by the supplemental records.[9]

In the opinion, the ALJ gave substantial weight to the mental status evaluation conducted on May 4, 2005, by Dr. Kenneth Hobby, a licensed psychologist. (Tr. 27-29) There is no evidence that the ALJ would have given greater weight, or any weight, to the

---

[9] The ALJ ultimately found that: "[d]ue to psychologically based symptoms, including depression, personality disorder and/or organic brain syndrome with a history of cannabis dependence, [Plaintiff] would require a work setting where interpersonal contact is routine but superficial; the complexity of tasks is learned by experience, with several variables and requiring the use of individual judgment within some limits; supervision required is little for routine tasks, but detained for non-routine tasks." (Tr. 23)

supplemental mental records even if Plaintiff had provided them in a timely manner.  The supplemental records and the mental status evaluation reach very different conclusions.  (Tr. 193-203, 286-324)  The mental status evaluation provided a medical opinion that was supported by other evidence in the record and, at least in part, by psychological tests.  (Tr. 193-203)  The supplemental records, however, do not qualify as "medical opinions" at all.  (Tr. 286-324)  Only statements from "accepted medical sources" qualify as "medical opinion."  20 C.F.R. § 404.1527(a)(2); 20 C.F.R. § 416.927(a)(2).  Licensed Professional Counselors and Licensed Clinical Social Workers are not "accepted medical sources."  20 C.F.R. § 404.1513(a); 20 C.F.R. § 416.913(a).  Instead, they are "other sources," just as relatives and neighbors who provide evidence.  20 C.F.R. § 404.1527(d)(1)-(4); 20 C.F.R. § 416.927(d)(1)-(4).  In addition, there is no reference in the supplemental records to treatment from an accepted medical source.  See *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) (holding that the opinions of a therapist who was not associated with an acceptable medical source were not entitled to great weight).

The supplemental medical records do not qualify as medical opinions, but they are still evidence for an ALJ to consider.  When determining the weight given to other medical evidence, the ALJ has more discretion and is allowed to consider any inconsistencies in the record.  *Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006) (citing *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)).  In the present case, the

supplemental records contain no explanation of how the GAF scores were reached. The supplemental records were not supported by objective psychological tests.

The wide range in GAF findings over short periods of time, without explanation for the differences, makes these records inherently inconsistent. For instance, Plaintiff's GAF score went from 45 on August 29, 2005, to 38 on September 1, 2005. (Tr. 299-300, 301) The only listed explanation for this change is that Plaintiff had been "threatened by a local thug." (Tr. 301) Plaintiff's GAF score went from a 55 to a 50 from July 27, 2007, to August 2, 2007. (Tr. 314, 312) The August 2, 2007, report states that there was no change in Plaintiff's condition from the last visit. (Tr. 312) Interestingly, Plaintiff's GAF score went from a 55 to a 50 between 10:42 a.m. and 2:00 p.m. of the same day, November 30, 2006. (Tr. 306, 308)

Even if the ALJ had erred by failing to seek out the supplemental records, Plaintiff has failed to show prejudice necessary for reversal. See *Lacroix*, 465 F.3d at 88 (finding no error when the ALJ gave more weight to an examining physician report, than to other medical source reports that were inconsistent and not supported by other evidence in the record or by objective psychological testing). Accordingly, the ALJ's determination that Plaintiff was not disabled is affirmed.

### V.   Conclusion:

There is substantial evidence in the record to support the Commissioner's denial of benefits to Plaintiff. Plaintiff undoubtedly suffers from pain deriving from his facial

injury and has some limitations from his illness. There is sufficient evidence, however, to support the ALJ's assessment that Plaintiff could perform a significant number of jobs in the national economy. Accordingly, Plaintiff's appeal is DENIED. The clerk is directed to close the case.

IT IS SO ORDERED this 15th day of September, 2009.

_____
UNITED STATES MAGISTRATE JUDGE